JUAN VEGA CAMACHO, Workman, etc., v. INDUSTRIAL COMMISSION OF PUERTO RICO ET AL., Respondents.

No. 209. Argued December 2, 1940.—Decided January 16, 1941.

*Virgilio Brunet* and *José L. Novas* for appellants. *George A. Malcolm, Attorney General, E. de Aldrey, Assistant Attorney General,* and *Víctor J. Vidal González* and *G. Atiles Moreu, Legal Advisers of the State Insurance Fund,* for respondents.'

MR. JUSTICE TRAVIESO delivered the opinion of the court.

The workman Juan Vega Camacho was a road mender charged by the Department of the Interior of Puerto Rico, which is an insured employer, with the duty of protecting and policing certain sections of Public Highways Nos. 54 and 2, in the vicinity of the town of Vega Baja. On April 11, 1936, which was a holiday it being Holy Saturday, between 2:30 and 3:30 in the afternoon, said workman was picked up in a dying condition on highway No. 2 and he died before or shortly after reaching his home.

The Manager of the State Fund held that the case was not a compensable one as he considered that in accordance with the report of the physician who performed the autopsy, the death of the workman had been caused by an advanced sclerosis of the coronary arteries which the workman suffered and not by any labor accident. After the decision of the manager had been affirmed by the Industrial Commission and a reconsideration of such affirmance timely applied for had been denied, the beneficiaries of the workman instituted the present proceeding, which they base on the following assignments of error:

"(*a*) The Industrial Commission erred in weighing the expert testimony and holding that the death of Juan Vega Camacho was due solely and exclusively to the fact that his heart disease had reached such a stage that death must overtake him whether he was working or not.

"(*b*) The Industrial Commission erred in holding that the death of Juan Vega Camacho was due to arteriosclerosis and not to coronary endarteritis.

"(*c*) The Industrial Commission erred in holding that the death of Juan Vega Camacho did not occur in consequence of a labor accident."

We shall consider said assignments jointly, as they all refer to the weighing of the expert and oral evidence.

Section 11 of the Workmen's Compensation Act, No. 45 of 1935 (Session Laws, p. 250), as amended by Act No. 121 of 1940 (Session Laws, p. 728), authorizes us to review any order or decision of the Industrial Commission, but it provides "that said review may be granted only on questions of law, or upon appreciation of the evidence when such evidence is of an expert nature."

The expert evidence may be summarized thus:

". . . The first witness was Dr. A. Otero López, who performed the autopsy of the deceased and he stated that when he uncovered the heart the latter was found contracted in systole and the coronary arteries were anemic, tortuous, prominent, hard, and unyielding to touch; and when he attempted to cut one of them, the scalpel found some resistance and a metallict sound was hear, and when he sought to expose the arteries it was found that the same were hardened by organic calcification. Answering questions put to him, he explained that the metallic sound produced by the scalpel on the arteries indicated the interior calcification of the latter, produced by the deposit in them of calcareous detritus by organic degeneration, the time being reached when the arteries become blocked and in consequence thereof anemia and finally death ensue, and the latter may occur at any time without any exertion on the part of the patient, as a result of the blocked arteries and the lack of blood circulation. That the calcification of the arteries is a slow process, a matter of years, not of days, nor of months, and that the death of the workman Juan Vega Camacho was due to coronary endarteritis which means hardening by calcification or fibrosity of the intima of the artery or inner layer thereof, and that the occurrence of his death while he was working was a mere coincidence, because he might equally have died from the lesion of his heart while eating or sleeping.

"Dr. Boneta, medical adviser of the Industrial Commission, testified that in view of the condition of the heart and of the coronary arteries of the deceased workman, according to the testimony of Dr. Otero which he had heard, an exertion made by the workman could have caused his death; he agreed with Dr. Otero that the condition of the arteries as described was a slow and gradual process and that starting from the basis that there was no rupture of blood vessels,

the death could have been caused by a deficiency in the blood supply of the heart and the same could have occurred while the patient was lying down as well as while he was working. The essence of the testimony of both physicians is that the heart lesion which Camacho suffered was in an advance stage it resulting from a process of calcification of the coronary arteries and that the unavoidable consequence of this condition was death.''

The theory of the appellant beneficiaries is that the workman died in consequence of the exertion made by him in order to lift an asphalt drum which had been placed on the edge of Highway No. 2 and which weighed from 3 to 4 hundredweight. In support of that theory the appellant beneficiaries introduced testimonial evidence, which was correctly summarized by the court, thus:

''Gregorio Nadal, who like Camacho, was a road mender and, as we have already stated, worked on a section of Highway No. 2 which was separated from that of Camacho by another section 4 kilometers long which was in charge of Manuel Miranda, testified: That on the day of the accident he went from his section of the highway to that of Camacho in order to help the latter put some asphalt on the road in compliance with an order to that effect which he had received from the chief Perfecto Díaz, and that as the day in question was Holy Saturday, both of them had been authorized to quit the work early and that they did so, the witness went home between 1:30 and 2:00 o'clock in the afternoon, leaving Camacho while the latter, preparatory to withdrawing also from the work, was gathering the appliances used therein; and that he learned of his death after the corpse had been taken home.

''Pedro Valentín, who is a brother of the widow of Camacho, and who accompanied by Pedro Ramos accidentally passed by the place where Camacho was on Highway No. 2, testified; that at a distance of some 20 to 25 feet, they saw the latter reclining on an asphalt drum and that when they got near him they both asked him what was the matter with him, and he answered that he had a great pain in his chest, and that then the witness and Ramos picked him up and carried him to his house which was located at a distance of one kilometer more or less from that place, he dying 4 or 5 minutes after he had been put in his bed.

"Pedro Ramos, who accompanied by the previous witness had accidentally passed by the place of the occurrence, stated that he saw Camacho from 15 or 20 meters before reaching his side; that the latter had his back turned to them and was making efforts to lift a drum, and that at that moment the drum fell and that when they got near he was complaining of a great pain in the chest; that they took him in their arms and carried him to his home, and when they arrived there he was already dead.

"Perfecto Díaz, road inspector in the highway in which Camacho, as well as Gregorio Nadal and Manuel Miranda worked, testified: that on the day of the occurrence no asphalt was being placed on Highway No. 2 and that the section of Highway No. 54 of which Camacho had charge as well as in Highway No. 2, the work of the road menders was confined to the clearing of grass with a machete from the ditches and edges of the road, and that he had given no order to do any asphalting on Highway No. 2, neither during the month of March nor in April, and that the only interruption in this routine work of clearing occurred on the 19th and 20th of March, when Camacho together with Manuel Miranda, the road mender assigned to the adjacent section, were instructed by him to do some repair work on Highway No. 2, which work, called 'stone binding,' consisted in filling up any existing hole with crushed stone, applying the paving beetle, and then putting asphalt on top; that save for those two days he gave no instructions to Miranda, to Nadal, or Camacho to do any asphalt work in Highway No. 2 and that the only time during those days which he spoke to Nadal or to Camacho was to tell them to go and collect their pay on the next Monday after Holy Week, and that by reason of the traditional festivity on Holy Saturday, although not an official holiday, all the road menders did their work in the lightest way possible, and that they were permitted to quit work and go home earlier than usual."

In weighing the oral evidence, the commission made the following findings:

"From that evidence it may be seen that Camacho made no exertion on that day. In the first place, because no asphalt work was being done on the highway were he was found dying, that would have justified the lifting by him of an asphalt drum; then because no order to that effect had been given by the chief, Mr. Perfecto Díaz; without the same, the character of the work being done by the road menders could not have been changed nor could any of them have

abandoned the section of which he had charge, as Nadal stated he had done in order to help Camacho on his section, and we fail to see what reason would have moved Mr. Perfecto Díaz, road inspector, to conceal that fact if it existed at all, when he would derive no benefit from it and when on the contrary he would cause a great and definite prejudice to the family of one of his employees. The only witness who asserts that he saw Camacho exerting himself to lift a drum was Pedro Ramos, who stated that he saw the former with his back turned at a distance of from 15 to 20 meters as if he were trying to lift an asphalt drum and that at that moment the drum fell on him, etc. We think that the position in which Ramos saw Camacho with his back turned at a distance of about 15 or 20 meters with his body leaning over a drum, does not allow the reaching of the definite conclusion that he was really trying to lift the latter; he might have been reclining on the drum resting by reason of the great pain which he felt in his chest due to the advance stage of the heart disease which he suffered. The very companion of Ramos, Pedro Valentin, a brother-in-law of Camacho, did not dare to make such a definite assertion as to what Camacho was doing, and confined himself to the statement that when he saw Camacho from a certain distance the latter was lying over a drum and when they got near him they found him in the same position on the drum, and he said that he had a pain, etc.

"Moreover, it is not likely that if, as stated by the road mender Nadal, who worked that day near Camacho and when he quit work he left Camacho gathering the implements used in the work in order to withdraw in his turn, all work on the highway had ended, Camacho should attempt to handle alone a drum weighing 4 hundredweight, when as stated before, the road menders were authorized to engage two workmen to help them lift the drums if that were necessary."

The expert testimony, to which the commission accorded credit, supports the conclusion reached by the commission to the effect that the disease which afflicted Camacho was the sole and exclusive cause of his death. The oral evidence was clearly insufficient to support the theory of the appellants and we think that the commission did not at all err in weighing the same.

The decision appealed from must be affirmed.